# United States Court of Appeals
## For the First Circuit

---

No. 04-1565

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLES H. ISLER,

Defendant, Appellant.

---

No. 04-1566

UNITED STATES OF AMERICA,

Appellee,

v.

BILAL ABDUL RASHID,

Defendant, Appellant.

---

No. 04-1673

UNITED STATES OF AMERICA,

Appellee,

v.

CHARLES C. BROWN,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Circuit Judge,
Hill, Senior Circuit Judge,*
and Howard, Circuit Judge.

James E. Methe for appellant Charles H. Isler.

William J. Murphy, with whom Murphy & Fay, LLP was on brief, for appellant Bilal Abdul Rashid.

Tamara A. Barney, with whom MacFadyen, Gescheidt & O'Brien was on brief, for appellant Charles C. Brown.

Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Adi Goldstein, Assistant United States Attorney, were on brief, for appellee.

November 16, 2005

*Of the U.S. Court of Appeals for the Eleventh Circuit, sitting by designation.

**HOWARD, Circuit Judge**. In these consolidated criminal appeals, defendants Charles Brown, Charles Isler, and Bilal Abdul Rashid challenge their convictions and sentences for participating in a cocaine base distribution conspiracy. We affirm the convictions and Brown's sentence, but vacate Isler and Rashid's sentences.

## I.

We present the facts in the light most favorable to the verdicts. See United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003).

On the afternoon of June 3, 2003, Detective Scott Partridge of the Providence Police Department was surveilling the rear of Brown's multi-family house from an adjacent yard. The house had previously been the subject of extensive surveillance, and the Providence police had executed a number of controlled buys of cocaine base from the first floor apartment. As Partridge watched, Brown pulled his car into his house's yard, which was empty except for an old junk car. Brown exited the car carrying a cheese puff container and a brown paper bag. Partridge saw Brown remove a plastic bag containing a white substance from the paper bag and place it in the false bottom of the container. Brown then returned the container to his car and entered the first floor apartment with the bag and its remaining contents. No one else entered or left the house.

Approximately half an hour later, Partridge and several other officers executed a search warrant for the apartment. Two of the officers covered the front door, and the rest entered through the back. All were clad in black windbreakers bearing the legend "Providence Police" in large, yellow letters. Partridge's team proceeded to the rear door of the first floor apartment, announced its presence, received no response, and then forcibly entered. The entry took considerable effort: the rear door was heavily fortified with steel bars, had no handle, and could be opened (from either side) only with a key for the heavy deadbolt lock. Also, a second interior door was wedged in tightly inside the fortified exterior door. Notably, the exterior door contained a four by six inch "cut out" and a large kitchen knife was hidden in the door's interior panel.

Brown, Isler, and Rashid were standing near the kitchen table when the officers entered through the back entrance, and attempted to flee through the front door. But upon hearing the other officers outside, they reversed field and attempted to force their way past the original entry team. A violent struggle ensued, and the defendants were subdued. Brown had $65 upon his person, Rashid had $1078, and Isler had $515.

The apartment was small and sparsely furnished, except for the kitchen. On the kitchen table, surrounded by three chairs, the officers found monitors for a sophisticated surveillance system

comprised of several cameras, a motion sensor, an intercom, and a pair of exterior lights -- one red and the other green. On the same table was the paper bag that Brown had carried into the apartment. Inside the paper bag were two plastic bags containing 142.45 grams of cocaine base. Also on the table were a digital scale, plastic bags, plastic bags with their corners snipped off, scissors, baking soda, a razor, a cooking plate with cocaine base residue, $250 in cash, two cell phones, a pager, and Isler's wallet and keys. The only key for the deadbolt lock on the fortified rear door hung on a hook near the table.

The officers also collected 26 small packages containing 6.328 grams of cocaine base from an overflowing toilet in a nearby bathroom. A search of Brown's car yielded the cheese puff container, which contained an additional 16.73 grams of cocaine base.

All three defendants were charged with conspiracy to possess with intent to distribute 50 or more grams of cocaine base (Count I), see 21 U.S.C. § 846, and possession with intent to distribute 50 or more grams of cocaine base (Count II), see 21 U.S.C. §§ 841(a)(1) & (b)(1)(A). In addition, based on the narcotics found in his car, Brown was charged with possession with intent to distribute 5 or more grams of cocaine base (Count III), see 21 U.S.C. §§ 841(a)(1) & (b)(1)(B).

At trial, the government called several officers and forensic specialists, and the government's case included expert testimony that the surveillance equipment, barricaded doors, and cut out[1] on the exterior door were indicative of a drug house. Only Brown testified for the defense. He testified that he had been let in by three unidentified men who left moments before the raid; that he was present only to collect rent from his tenant; that there were no drugs in the house or his car; that he had never seen Rashid or Isler before the raid; that Rashid was there to purchase his tenant's minivan; that Isler was sitting in a bedroom (possibly listening to music); that there were at least four cars in the yard at the time of the raid; that he tried to let the police in when they knocked but they ordered him away from the door; that the defendants did not try to flee or resist; and that the security and surveillance equipment had been installed by the previous owner and/or was typical for homes in the area.

The jury convicted Brown on all counts. The jury also convicted both Isler and Rashid, but held them responsible for less than 5 grams of cocaine base on both counts (and not for the 50 or more grams originally charged in the indictment). Isler and Rashid were sentenced to 262 and 210 months' imprisonment, respectively.

---

[1] The cut out was large enough to pass drugs and money through, but small enough that a drug purchaser could not get a clear look at the seller on the other side of the door.

Brown received a mandatory life sentence because he had two prior felony narcotics convictions. See 21 U.S.C. § 841(b)(1)(A).

II.

The defendants challenge their convictions and sentences on several grounds. The primary appellate issues are (1) whether there was sufficient evidence to sustain Isler and Rashid's convictions; (2) whether the district court erroneously permitted detailed cross-examination concerning Brown's prior convictions; (3) whether the court abused its discretion when it admitted testimony from one of the government's experts; (4) whether the government's closing argument was inappropriate and prejudicial; (5) whether the court should have applied the rule of lenity to sentence Brown to a shorter prison term because the relevant provisions of 21 U.S.C. § 841 are ambiguous; and (6) whether the defendants are entitled to resentencing under United States v. Booker, 125 S. Ct. 738 (2005).[2]

**A. Sufficiency of the Evidence**

Rashid and Isler claim that the district court erroneously denied their motions for acquittal because the government demonstrated only that they were "merely present" at the

[2] The government maintains that certain of the defendants' arguments were not preserved for plenary appellate consideration. We shall assume, without deciding, that the issues were properly preserved unless we state otherwise.

drug raid.[3] See United States v. Llinas, 373 F.3d 26, 32 (1st Cir. 2004)(government must prove more than mere presence to obtain drug conspiracy conviction). Isler and Rashid maintain that they did not own the house, that the three defendants had never met before the raid, that neither Rashid nor Isler was ever in the house before the raid, and that there was no evidence that they possessed or agreed to possess the narcotics.

We review the denial of a motion for acquittal de novo. See Boulerice, 325 F.3d at 79. We will affirm if, after reviewing all the evidence in the light most favorable to the government and drawing all reasonable inferences in its favor, we conclude that a rational jury could find the essential elements of the crime proved beyond a reasonable doubt. Id.

Isler and Rashid argue as though only direct evidence can support their convictions. But of course, this is not so; indeed the government may rely entirely on circumstantial evidence to prove the charged offense. See United States v. Soler, 275 F.3d 146, 150 (1st Cir. 2002); see also United States v. Batista-Polanco, 927 F.2d 14, 19 (1st Cir. 1991)(a conspiracy can be demonstrated by "a development and a collocation of

[3] Rashid also makes a passing attempt to assign error to the district court's failure to provide a limiting instruction that he had requested. But Rashid's argument is undeveloped and therefore forfeited. See United States v. Vasquez-Guadalupe, 407 F.3d 492, 499-500 (1st Cir. 2005). In any event, there was no abuse of discretion, as the district court ultimately instructed the jury that Brown's prior convictions could only be considered in evaluating Brown's credibility.

circumstances")(internal citation and quotation omitted). As we have explained:

> The defendant's presence at a place where contraband is found may or may not be purely coincidental. The attendant circumstances tell the tale - and the culpability of a defendant's presence hinges upon whether the circumstances fairly imply participatory involvement. In other words, a defendant's "mere presence" argument will fail in situations where the "mere" is lacking.

United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993).

The facts surrounding Isler and Rashid's arrest permitted the jury to find that they were more than merely present. Detective Partridge saw Brown bring a substance that proved to be cocaine base into the house. When the officers burst through the heavily fortified back door, Isler, Rashid, and Brown were the only persons in the apartment and were standing near the kitchen table with three chairs. On the kitchen table were the monitors for an elaborate surveillance system, a quantity of cocaine base suggestive of narcotics distribution (and not personal use), cash, Isler's wallet and keys, and various drug packaging paraphernalia. In the bathroom, a few feet away, was evidence of a hasty and unsuccessful attempt to flush more cocaine base down the toilet. Compare Soler, 275 F.3d at 151; Echeverri, 982 F.2d at 678-79; Batista-Polanco, 927 F.2d at 17-19.

Further, the house was a fortress, with heavily reinforced doors and an extensive surveillance system. From this

evidence, the jury could have inferred that the dealers wished to conduct their business in absolute secrecy and security, and that only the conspiracy's participants would be permitted into the apartment. See generally Llinas, 373 F.3d at 32 ("criminal conspirators do not involve innocent persons at critical stages of a drug deal"); United States v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997) (criminals do not welcome innocent bystanders as witnesses to their crimes); United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992)(criminals "rarely seek to perpetrate felonies before larger-than-necessary audiences").

Finally, the defendants fled from the police, and, when cornered, engaged a violent struggle with the officers. In appropriate circumstances, flight can be probative of guilt. See United States v. Carpenter, 403 F.3d 9, 12 (1st Cir. 2005); United States v. Otero-Mendez, 273 F.3d 46, 53 (1st Cir. 2001).

In sum, the district court properly concluded that there was sufficient evidence to support the convictions.[4]

**B. Prior Convictions**

Brown contends that the district court abused its discretion and prejudiced his defense by permitting the government to cross-examine him in detail about his prior convictions before later ruling that the evidence was inadmissible.

---

[4] For these same reasons, it was not an abuse of discretion for the district court to deny Isler and Rashid's motions for a new trial. See Montilla-Rivera, 115 F.3d at 1064.

Brown had three prior felony narcotics convictions, all involving marijuana. Before trial, the government filed a notice of intent to introduce the prior convictions for impeachment, see Fed. R. Evid. 609, and as admissible other bad act evidence, see Fed. R. Evid. 404(b), in anticipation of a mere presence defense. Brown never objected to the notice or filed a motion in limine to exclude the evidence. On direct examination, Brown testified about the basic facts of his prior convictions.[5] On cross-examination, the government re-elicited these basic facts and then inquired, under Rule 404(b), about the historical facts underlying his record. During the government's rebuttal argument, the prosecutor made reference to Brown's testimony about his prior convictions and Brown objected. After a bench conference, the court ruled that the 404(b) evidence of prior convictions was not allowed and instructed the prosecutor to refrain from making additional reference to it. The court did not, however, strike the prior testimony concerning the details of the prior convictions. Brown argues that he was prejudiced by the court's failure to exclude the 404(b) evidence. The government contends that there was no abuse of discretion and, in any event, the challenged testimony was harmless.

---

[5] Brown admitted the following convictions and sentences: (1) a 1992 conviction for possession of marijuana for which he served six months of a four-year sentence; (2) a 1995 conviction for possession of 1-5 kilos of marijuana for which he served three years of a fifteen-year sentence; and (3) a 1995 conviction for possession of marijuana with intent to deliver and conspiracy to traffic in marijuana for which he served three years of a ten-year sentence.

We choose to proceed directly to the harmless error inquiry. "[T]he admission of improper testimony is harmless if it is highly probable that the error did not influence the verdict." United States v. Garcia-Morales, 382 F.3d 12, 17 (1st Cir. 2004). A harmless error analysis is case specific, and requires consideration of such factors as the "centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which the evidence was put, and the relative strengths of the parties' cases." Id.

Brown focuses on the admission of three facts: (1) that he did not remember the weight of the marijuana involved in one offense (but the prosecutor suggested ten pounds); (2) his exculpatory account of his involvement in one offense (essentially that Brown threw the marijuana in the trash at someone's behest); and (3) that he was arrested for one offense with $16,000 on his person. In the circumstances of this case, we conclude that these facts did not sway the jury.

The challenged facts added little to the basic facts of convictions, which had been recounted twice on direct and cross-examination. Moreover, they were not highlighted in the prosecution's argument, and were inconsequential when evaluated

against the balance of the prosecution's considerable evidence.[6] Any error in the admission of this evidence was harmless.

**C. A'Vant's Testimony**

Brown argues that the district court abused its discretion by admitting certain testimony from Officer Angelo A'Vant, one of the government's expert witnesses, concerning the features of a drug house. Brown does not challenge A'Vant's qualifications as an expert. Rather, he challenges the relevance of his testimony to Brown's house. Specifically, Brown complains that A'Vant was permitted to testify that the security and surveillance set-up at Brown's house was something that he had never previously seen.[7] According to Brown, this testimony was irrelevant and highly prejudicial because it permitted the prosecutor to argue that the defendants were unusually "sophisticated" criminals. Brown concedes that our review is for

---

[6] Brown also argues that the prosecutor committed misconduct by referring to Brown's prior convictions during cross-examination and closing argument. But as we have explained, it was not apparent until the government's rebuttal argument that the prior conviction evidence was off-limits. After the district court's ruling, the prosecutor made no further mention of the convictions. There was no misconduct.

[7] Brown complains only about two snippets in A'Vant's direct testimony. In the first, A'Vant responded to the question whether he had ever encountered barricaded doors on "routine" police calls (as distinguished from drug raids) as follows: "On routine calls, I have never seen a similar set-up like this is my career." In the second, in response to the question how many times he had seen a green light bulb in the hallway of a residence during his years as a patrol officer, A'Vant stated: "I don't ever recall seeing a green light bulb."

plain error only. A plain error must be "clear or obvious, affect substantial rights, and seriously affect the fairness, integrity, or public reputation of judicial proceedings." Garcia-Morales, 382 F.3d at 18.

Brown's argument fails for many reasons, the most basic of which is that he misstates the essence of A'Vant's testimony. Prior to the challenged testimony, A'Vant had testified at length that the barricades and surveillance features on Brown's house were consistent with those at other drug houses that he had raided. The routine patrol questions were intended to show that "normal" houses in the area did not have such features. This testimony was responsive to Brown's defense that he was merely present at the crime scene, which Brown supported with his testimony that his house was just like any other house in that part of Providence. In short, A'Vant simply did not testify that he was unfamiliar with the equipment at Brown's house. There was no error in the admission of A'Vant's testimony, plain or otherwise.[8]

**D. Prosecutorial Misconduct**

Isler claims that the prosecutor, during her closing argument, twice improperly shifted the burden of proof to the defendants and improperly vouched for the government witnesses.

[8] Having dispatched each of Brown's individual assignments of prejudicial error, we summarily reject his claim that the alleged errors combined to deprive him of a fair trial.

In the first challenged remark, the prosecutor was discussing Brown's testimony regarding the house's security features:

> Charles Brown would have you believe that this is to protect people from burglary, that this set-up is all over the place. In fact, it's in the other apartment that he owns. Well, where is the documentary proof of that, ladies and gentlemen? None. You just have Charles Brown's word.

Brown's counsel objected, and the district judge sustained the objection and instructed the jury to disregard the remark.

The second challenged remark concerned Brown's claim that he was merely present at the crime scene to collect rent from his tenant:

> And he tells you that he went in to collect the rent. Well, if he went to collect the rent, why didn't he take his rent receipt book with him? You know why, ladies and gentlemen. Because there is no rent receipt book, because he wasn't there to collect the rent, because there was no tenant, because again, ladies and gentlemen, other than Charles Brown's word, there is no proof of Anthony Wilson as a tenant. His name is not on the utility bills.

The district court again sustained defense counsel's objection and instructed the jury to disregard the statement. The prosecutor then stated:

> So you have to choose in whom you're going to place your trust, ladies and gentlemen, and you know in whom the defense placed their trust. They embraced the testimony . . . .

Defense counsel interrupted the prosecutor with an objection, which the court sustained.

None of these lines of argument was improper. Isler's "burden shifting" claim disregards the fact that Brown testified at length and that all the defendants endorsed Brown's testimony in their closings. "[W]hen a defendant puts [his] credibility at issue by testifying, the prosecution can comment on the implausibility of [his] testimony or its lack of evidentiary foundation." Boulerice, 325 F.3d at 86. Here, the prosecutor merely called attention to the lack of supporting evidence for Brown's implausible assertions and attempted to highlight the fact that rival accounts had been presented to the jury.

In addition to burden shifting claims, Isler also argues that the prosecutor improperly placed her prestige as a government officer behind the testimony of the police officers. The challenged comment came on the heels of suggestions by defense counsel that the officers' testimony (in particular Partridge's) contained gaping inconsistencies which were indicative of fabrication.

The prosecutor began by recounting that the officers all remembered the significant matters the same way, that the differences in recollection were trivial, and that the jury should be more concerned if there were not small variations in their testimony. She continued:

> If Detective Partridge was so frustrated, if they were all so intent on securing a conviction against these Defendants, wouldn't they have come up with a better story, ladies and gentlemen? Why not put the keys to the doors of the apartment on the key chain of one of the Defendants? Why not put the drugs in the Defendants' pockets? Why not tell you that they observed one of the Defendants run out of the bathroom? Why not tell you that they saw the three Defendants together numerous times prior to June 3rd?
>
> Ladies and gentlemen, that is how you evaluate the credibility of that testimony. It has the ring of truth. Conspiracies are secret. They happen behind locked doors.

Defense counsel objected and moved for a mistrial. The district court sustained the objections, instructed the jury to disregard the "ring of truth" comment, and took the motions for mistrial under advisement.[9]

"A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by . . . imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003).

The challenged remarks do not constitute improper vouching. First, arguing why a witness should be believed or asking jurors to use their common sense in assessing witness testimony is not vouching. See Id. at 10; Rodriguez, 215 F.3d at

---

[9] These motions were later denied.

123. Second, the prosecutor did not express her personal views regarding the officers' accounts or imply that they should be believed because they were government officials. See Perez-Ruiz, 353 F.3d at 10. Third, the comments were a logical counter to the defense claim of witness fabrication, and we have upheld such rejoinders. See United States v. Wilkerson, 411 F.3d 1, 8 (1st Cir. 2005); United States v. Vazquez-Rivera, 407 F.3d 476, 483-84 (1st. Cir. 2005); Perez-Ruiz, 353 F.3d at 10.

**E. Ambiguity in Cocaine/Cocaine Base Provisions**

Brown argues that he should have received a lower sentence under 21 U.S.C. § 841 under the rule of lenity. Brown begins with the fact that a certain quantity of "cocaine base" will trigger a far harsher sentence than the same quantity of "cocaine, its salts, optical and geometric isomers, and salts of isomers." Compare 21 U.S.C. § 841(b)(1)(A)(ii)(II) & (B)(ii)(II) with 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii). From there he reasons that because "cocaine base" and "cocaine" are chemically identical and the substance "cocaine base" falls within the extended definition of "cocaine" ("cocaine, its salts, optical and geometric isomers, and salts of isomers"), the penalty provision in 21 U.S.C. § 841 is fatally ambiguous because a conviction for possessing "cocaine base" would appear to be eligible for punishment under both the "cocaine" and "cocaine base" penalty provisions. Therefore, Brown posits, because the jury found only that he possessed "cocaine

base," he is entitled to receive the statutory sentence provided for distributing more than 50 grams of "cocaine," relying upon United States v. Brisbane, 367 F.3d 910 (D.C. Cir. 2004).[10] Brown again concedes that our review is for plain error only.

We readily conclude that there was no plain error. First, Brown's claim that "cocaine" and "cocaine base" are chemically identical is inaccurate. See United States v. Robinson, 144 F.3d 104, 108-9 (1st Cir. 1998)(noting differing chemical formulas); United States v. Barnes, 890 F.2d 545, 552 (1st Cir. 1989)("the term 'cocaine base' clearly defines a substance differing from other forms of cocaine"). Second, this court has concluded that the term "cocaine base" in Section 841(b) includes all forms of cocaine base (not simply crack). See United States v. Medina, __ F.3d __, 2005 WL 2740828, at *3 (1st Cir. 2005); United States v. Richardson, 225 F.3d 46, 49 (1st Cir. 2000); United States v. Lopez-Gil, 965 F.2d 1124, 1134 (1st Cir. 1992)(opinion on rehearing). See also Barnes, 890 F.2d at 553 (cocaine base provision not unconstitutionally vague). In this case, the government presented undisputed evidence that the substance seized

[10] Holding that, in the absence of proof the "cocaine base" that defendant possessed was crack or another smokable form of cocaine base(which Congress intended to punish more severely than "cocaine"), defendant was entitled to be sentenced under "cocaine" penalty provision. See Brisbane, 367 F.3d at 913-15.

was cocaine base, and the jury so found. There was no error in Brown's sentence.[11]

**F. Booker**

All three defendants argue that they are entitled to a remand for resentencing under Booker. They all maintain that the district judge's comments at sentencing clearly indicate that she would have imposed a lower sentence if the guidelines were not mandatory. In addition, they contend that drug quantity and the existence of their prior convictions are facts that must be found by a jury. All three concede that our review is for plain error only.

To establish a plain error under Booker, a defendant must demonstrate (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously impairs the fairness, integrity, or public reputation of judicial proceedings. See United States v. Antonakopoulos, 399 F.3d 68, 77 (1st Cir. 2005). The first two prongs are met if the district court treated the Sentencing Guidelines as mandatory. Id. Thus, we must determine if the defendants satisfy the third and fourth prongs of the test.

In the sui generis circumstances of assessing the

---

[11] As to Brown's reliance on Brisbane, the clear or obvious error prong is not satisfied where the district court declined to follow a case from another circuit that concedes it is expressing a minority view and is explicitly at odds with this circuit's precedent. Cf. United States v. D'Amario, 412 F.3d 253, 256-57 (1st Cir. 2005)(no plain error if circuit courts are split on issue).

appropriateness of a Booker remand under the plain error standard, our cases have consistently held that a remand is appropriate if the district judge has made comments in the sentencing record indicating a reasonable probability that she would have imposed a lower sentence if unshackled by the mandatory guidelines. See Antonakopoulos, 399 F.3d at 81; United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005); Wilkerson, 411 F.3d at 10. As to prongs three and four, "our principal concern in these Booker 'pipeline' cases is with the likelihood that the defendant would have received a lesser sentence in a post-Booker regime of advisory guidelines." Heldeman, 402 F.3d at 224; see also Wilkerson, 411 F.3d at 10.

We begin with Isler and Rashid, both of whom were sentenced at the bottom of their respective guideline ranges. In both their sentencing proceedings, the district judge made a host of comments about her lack of discretion under the guidelines and the "waste" brought about by the length and extreme harshness of the sentences. Moreover, the district judge stated that the sentence was "tragic" because she was "not sure that a sentence of this length is absolutely necessary" and that she was not sure that, in the absence of the guidelines, she "would have imposed that harsh a penalty." In light of these remarks, which indicate a reasonable probability of lower sentences under advisory guidelines, Isler and Rashid are entitled to resentencing.

Brown is less fortunate for two reasons. First, Brown received a mandatory statutory (rather than guidelines) life sentence based upon the instant convictions and his two prior narcotics convictions (the existence of which he admitted). Booker does not apply in such circumstances. See Antonakopoulos, 399 F.3d at 75 ("A mandatory minimum sentence imposed as required by statute based on facts found by a jury or admitted by a defendant is not a candidate for Booker error"); United States v. Bermudez, 407 F.3d 536, 545 (1st Cir. 2005)(same). Second, Brown's contention that his criminal history must be proved to a jury beyond a reasonable doubt is foreclosed by our recent precedent. See United States v. Work, 409 F.3d 484, 491 n.1 (1st Cir. 2005)("In the roiled wake of Booker, it remains the law that previous criminal convictions are not 'facts' that must be found by a jury and proved beyond a reasonable doubt."); United States v. Lewis, 406 F.3d 11, 21 n.11 (1st Cir. 2005)(same).[12]

---

[12] Brown also argued in his initial brief that the district court erred in determining that his prior convictions were unrelated under the guidelines. However, Brown later conceded that this is a statutory rather than a guidelines determination. See United States v. De Jesus Mateo, 373 F.3d 70, 74 (1st Cir. 2004). In his reply brief and at oral argument, Brown made a related argument that the district court erroneously applied the guidelines standard rather than the statutory standard in determining whether his prior convictions involved distinct criminal episodes for purposes of 21 U.S.C. § 841(b)(1)(A). This claim is forfeited. See United States v. Evans-Garcia, 322 F.3d 110, 114 (1st Cir. 2003) (arguments not raised until reply brief are waived); Gosselin v. Commonwealth of Massachusetts, 276 F.3d 70, 72 (1st Cir. 2002) (arguments not raised until oral argument are waived). Moreover, the facts regarding the circumstances of the two prior offenses, notably the significant gap between the offenses and the intervening arrest

**III.**

For the reasons stated above, Isler and Rashid's convictions are **affirmed**, their sentences are **vacated**, and their cases are **remanded** for resentencing in accordance with this opinion. Brown's conviction and sentence are **affirmed**.

**So ordered.**

---

(which Brown conceded below and on appeal), make it clear that the offenses were distinct criminal episodes. See generally De Jesus Mateo, 373 F.3d at 74; Martinez-Medina, 279 F.3d at 123.

Brown also argues that Almendarez-Torres v. United States, 523 U.S. 224 (1998) should be overruled. However, he concedes that this is beyond this court's power, and states that he merely intends to preserve the issue for possible review before the U.S. Supreme Court.